**A F F I D A V I T**



SEALED

**STATE OF WEST VIRGINIA**

**COUNTY OF KANAWHA, to-wit:**

I, Ambra M. Dunn, being first duly sworn, do hereby depose and state as follows:

<u>INTRODUCTION AND AGENT BACKGROUND</u>

1. I make this affidavit in support of an application for a search warrant to search a residence located at 1629 Chandler Drive, Charleston, West Virginia 25387 (hereafter referred to as "SUBJECT PREMISES") and used by KARL FUNDERBURK (hereafter referred to as "FUNDERBURK") for the purpose of storing, using, and distributing controlled substances. As set forth herein, probable cause exists that FUNDERBURK has committed and continues to commit violations of the following offenses enumerated in Title 18, United States Code, Section 2516(1): (i) the distribution and possession with intent to distribute controlled substances in violation of Title 21, United States Code, Section 841(a)(1); (ii) conspiracy to commit and attempts to commit these offenses, in violation of Title 21, United States Code, Section 846; and (iii) use of a communications facility in facilitating the commission of the foregoing offenses, in violation of Title 21, United States Code, Section 843(b) ("TARGET OFFENSES"). Further, probable cause exists that evidence, proceeds, and fruits and instrumentalities

1

of those offenses are currently located within the SUBJECT PREMISES more particularly described in ATTACHMENT A.

2. I am a Special Agent employed by the United States Department of Justice, the Drug Enforcement Administration (hereinafter "DEA"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants. I have been employed as a Special Agent of the DEA since January 2018. I am currently assigned to the DEA Charleston District Office, Charleston, West Virginia. I have received 17 weeks of training in narcotics investigations and related legal matters while attending the DEA Training Academy in Quantico, Virginia. Prior to my employment as a Special Agent with the DEA, I was employed as a Police Officer by the City of East Point, Georgia Police Department for approximately seven years and then assigned to the DEA Atlanta Field Division as a Task Force Officer for approximately two years. I am currently assigned to the DEA Charleston District Office, High Intensity Drug Trafficking Area ("HIDTA") Group 1.

3. During my tenure with the DEA, I have participated in numerous drug investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at locations where drugs, drug proceeds, and records of drugs have been found; (c) reviewed and analyzed numerous taped conversations and records of drug traffickers; (d) debriefed cooperating drug

traffickers; (e) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in drug trafficking. Through my training, education, and experience, I have become familiar with (a) the manner and methods by which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. I am an investigative or law enforcement officer within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. Among other duties, I am participating in an investigation relating to the distribution of controlled substances by ANTONIO JEFFRIES; FUNDERBURK; DEAYRIA WILLIS (hereinafter "WILLIS"); other persons known; and others as yet unknown ("SUBJECTS" or "SUBJECT INDIVIDUALS"), in violation of 21 U.S.C. §§ 841(a)(1), 843(b), and 846, that is, distribution of controlled substances; use of a communication facility to facilitate drug trafficking; and conspiracy to distribute controlled substances.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers, and witnesses. Summaries of recorded conversations are based on draft transcripts

3

of those conversations.  This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all my knowledge about this investigation.

6. On January 24, 2023, the Honorable Thomas E. Johnston, Chief United States District Court Judge in the Southern District of West Virginia, authorized interception of wire and electronic communications over TARGET TELEPHONE #4, a telephone used by ANTONIO JEFFRIES (hereinafter "JEFFRIES"); wire communications over TARGET TELEPHONE #5, another telephone used by JEFFRIES; wire and electronic communications over TARGET TELEPHONE #6, a telephone used by FUNDERBURK; wire communications over TARGET TELEPHONE #7, a telephone used by WILLIS; and wire communications over TARGET TELEPHONE #8, a telephone used by ALEXIS LITTLEBERRY, for thirty days.  Interceptions were terminated over TARGET TELEPHONE #8 on February 6, 2023 due to minimal activity.  Interceptions over TARGET TELEPHONES #4, #5, #6, and #7, expired on February 22, 2023.  On February 28, 2023, the Honorable Thomas E. Johnston, Chief United States District Court Judge in the Southern District of West Virginia, authorized interception of wire and electronic communications over  TARGET TELEPHONE #6, a telephone used by FUNDERBURK; wire and electronic communications over TARGET TELEPHONE #9, a telephone used by TRES AVERY DAVIS (hereinafter "DAVIS"); and wire communications over TARGET TELEPHONE #10, a telephone used by MICHAEL ALLEN ROBERTS, JR., for

4

thirty days.   Interceptions over TARGET TELEPHONES #6, #9, and #10, are scheduled to expire on March 29, 2023.

### **Probable Cause**

7. Based upon the facts of this investigation and the proceeding information, probable cause exists that FUNDERBURK currently stores controlled substances, firearms, currency and other evidence of drug trafficking more fully described in ATTACHMENT B at the SUBJECT PREMISES. Investigators have checked law enforcement databases and open source records to find addresses associated with FUNDERBURK. Those sources associated the SUBJECT PREMISES with FUNDERBURK. FUNDERBURK's current vehicle registration for his 2008 Dodge Charger bearing West Virginia registration N3G721 shows his residence to be the SUBJECT PREMISES. Further, investigators have conducted physical surveillance, as well as obtained court orders for geolocation information from TARGET TELEPHONE #6, all of which have shown FUNDERBURK to be frequently present at the SUBJECT PREMISES. Based on the timing and frequency of FUNDERBURK's presence at the SUBJECT PREMISES, investigators have concluded that FUNDERBURK stays there regularly.

8. On or about August 13, 2018, FUNDERBURK was convicted in the United States District Court for the Southern District of West Virginia of the felony offense of Use of Firearm in the Furtherance of Drug Trafficking Crime in violation of 21 U.S.C. § 924(c)(1)(A).

FUNDERBURK received a prison sentence of 60 months, to the followed by five years of supervised release. FUNDERBURK is on federal supervised release until 2026. FUNDERBURK has advised his probation officer that he resides at 1102 Cross Roads Village Drive, Nitro, West Virginia, but according to the geolocation information received by investigators from TARGET TELEPHONE #6, it does not appear he is residing there.

9. On December 28, 2022, at 11:40 AM, JEFFRIES, on TARGET TELEPHONE #4 (Session 00317), received an incoming call from FUNDERBURK, on TARGET TELEPHONE #6. The following was discussed:

| | |
|---|---|
| **JEFFRIES:** | Yo. |
| **FUNDERBURK:** | Hey yo! Hey yo! |
| **JEFFRIES:** | What up? |
| **FUNDERBURK:** | Somebody bust the truck window last night bro. You hear me? |
| **JEFFRIES:** | Who did that? |
| **FUNDERBURK:** | Bro, I do not know. One of them sayin' God damn, somebody mutha' fuckin' last night, snoop around the house. She said they had black masks on and shit like that. It's just a coincidence bro. This shit a coincidence. I see this nigga ride by, and mutha' fuckin'.. they, they got the shit that was in the truck. They left the Glock. They didn't get the shit |

that we put in there last night. You hear me?
They got all the girl out of the truck. What
was still in there?

**JEFFRIES:**   I uh.. aww man.

**FUNDERBURK:**   They got the girl, they got the girl, they
didn't get the whatcha call it, they didn't
get the turkey's. We got to move this shit
though... Know what I'm sayin', some,
somebody from the Woo named, Mook uh not,
uhh, damn what he just said? He said three
nigga's is outside my house at four o'clock
this morning with sticks. He said they
standing on the other side of the street. So
God damn when he called my phone, called my
phone, called my phone, when I wake up this
mornin', I called him back. So I called. You
hear me?

**JEFFRIES:**   Yeah.

**FUNDERBURK:**   How much girl was in there?

**JEFFRIES:**   Shit man, like 20 some zips. 20 zips.

**FUNDERBURK:**   I thought you.. I thought it was just 8.
What did you take outta that mutha' fucka'?

**JEFFRIES:**   What you mean you thought it was just 8?

**FUNDERBURK:**   I don't know how many bro. I'm just

|  |  |
|---|---|
|  | tellin' you God damn, somebody mutha' fuckin' laid on us bro. That shit make me. Say what? |
| JEFFRIES: | What was, what was in there when you ook that apple juice? |
| FUNDERBURK: | Shit, the whole bag was there! I don't know, I just grabbed, I just grabbed the hard out of it. They bust the window. Left the God damn Glock. |
| JEFFRIES: | They ain't keep lookin' for the Glock. |
| FUNDERBURK: | I know that's what probably what it was, wasn't it? They grabbed that first bag. |
| JEFFRIES: | That first bag. |
| FUNDERBURK: | Damn man. Uh, uh fuckin' (Room) said its' somebody from the Woo named uhh.. uhh.. Moody, Moody, Moo, Moo, Mooka, Mook, some nigga like 38 or something. Said tall dark skinned nigga. |
| JEFFRIES: | Who? |
| FUNDERBURK: | Huh? |
| JEFFRIES: | Who? Who? Who said.. |
| FUNDERBURK: | Somebody from the Woo named Mooda Bro. Mookum, Mooka, some shit like that. |
| JEFFRIES: | [UI] take away. |
| FUNDERBURK: | Huh? |

8

| | |
|---|---|
| **JEFFRIES:** | I don't know who that is bro. That don't even sound right. |
| **FUNDERBURK:** | Man, God damn man. |
| **JEFFRIES:** | They didn't show up on your cameras? |
| **FUNDERBURK:** | Nah, they didn't show up. |
| **JEFFRIES:** | Maybe those cameras will get em. |
| **FUNDERBURK:** | But look, I finna to show you my screen... [To someone] Let's show the man some God damn.. |

10.     Based on my training, experience, and the investigation thus far, I believe FUNDERBURK told JEFFRIES that someone broke into a truck the night before that was parked at the SUBJECT PREMISES. ("Somebody bust the truck window last night bro. You hear me?"). JEFFRIES asked who broke into the truck ("Who did that?"). FUNDERBURK stated that the burglars left a Glock firearm but took all of the cocaine and then asked JEFFRIES what else was in the truck ("They left the Glock. They didn't get the shit that we put in there last night. You hear me? They got all the girl out of the truck. What was still in there?"). FUNDERBURK proceeded to tell JEFFRIES that they got all of the cocaine but they did not get the other controlled substances and that they needed to move the remaining controlled substances to a new location ("they got the girl, they got the girl, they didn't get the whatcha call it, they didn't get the turkeys. We got to move this shit though.").

JEFFRIES stated that there was approximately 20 ounces of cocaine in the bag that was stolen ("Shit like 20 something zips. 20 zips."). After reviewing this call, surveillance located a silver Ford Expedition with the back passenger window busted out parked in a parking area next to the SUBJECT PREMISES.

11.     On January 29, 2023, law enforcement officers conducted surveillance on WILLIS, driving a black Kia Optima bearing North Carolina registration JFK8867, to the Mercer County Mall located at 261 Mercer Mall Road, Bluefield, West Virginia, 24701 (hereinafter "Mercer County Mall"). Officers were able to set up in the area to conduct physical surveillance and use an aerial drone to conduct surveillance on WILLIS in the area of the Mercer County Mall on that date. Officers observed WILLIS go inside the mall, come back out, and sit in her vehicle for a long period of time. On the same date, officers were also conducting surveillance on a residence located at 194 Jewell Court, Bluefield, West Virginia 24701 (hereinafter "194 Jewell Court"). Officers were able to observe a black male in a brown coat come out of 194 Jewell Court and get into a 2012 Kia Optima LX bearing West Virginia registration 4WN522. While WILLIS was sitting at the Mercer County Mall waiting, the 2012 Kia Optima LX bearing West Virginia registration 4WN522 left 194 Jewell Court. The 2012 Kia Optima LX bearing West Virginia registration 4WN522 was observed arriving at the Mercer County Mall where it drove a lap around the whole mall

in what officers believed to be an attempt to identify any law enforcement officers in the area. The 2012 Kia Optima LX bearing West Virginia registration 4WN522 then went back to 194 Jewell Court. WILLIS stayed parked in the parking lot of the Mercer County Mall during this time. Law Enforcement also observed a white GMC Denali 1500 bearing West Virginia registration O6A397 pull up to 194 Jewell Court and a white female wearing a black jacket get out of it. Law enforcement observed the female put what appeared to be plastic bags in the rear of the GMC Denali, and the GMC Denali then left the area. A maroon Ford F250 bearing West Virginia registration 9LS522 registered to Rachel Holleman out of Bluefield, West Virginia was also observed at 194 Jewell Court for a short period of time. During this time, WILLIS left the parking lot and drove down U.S. Route 460 for a distance, then turned around and came back to the Mercer County Mall parking lot and parked. Around this same time, law enforcement observed the 2012 Kia Optima LX bearing West Virginia registration 4WN522 leaving 194 Jewell Court with a black male wearing a brown coat in it. Surveillance observed the 2012 Kia Optima LX bearing West Virginia registration 4WN522 come to the Mercer County Mall and park in front of the Planet Fitness. WILLIS then pulled up beside the 2012 Kia Optima LX bearing West Virginia registration 4WN522, got out of her vehicle, and leaned over into the passenger side window of the 2012 Kia Optima. Seconds later, WILLIS turned around and got

11

back into her vehicle. WILLIS (in her vehicle) and the 2012 Kia Optima LX bearing West Virginia registration 4WN522 then departed the Mercer County Mall going separate directions. Law enforcement was able to follow WILLIS back to Charleston, West Virginia and observe that WILLIS did not make any stops prior to arriving in Charleston, West Virginia. Law enforcement observed WILLIS travel directly to the SUBJECT PREMISES. Surveillance observed a Jeep that officers have observed JEFFRIES driving along with a Dodge Charger that officers have observed FUNDERBURK driving, both parked in the area of the SUBJECT PREMISES. After a few minutes, WILLIS left the SUBJECT PREMISES and then left Charleston, West Virginia.

12. On January 29, 2023, at approximately 8:22 P.M. (Session 0999). FUNDERBURK spoke to a male identified in the call as "Jimmy." FUNDERBURK told Jimmy ("I need uh one of your people to try some shit for me.", "I need them to try this dope for me [U/I]"). Based on my training, experience, and the investigation thus far, I believe FUNDERBURK was trying to find someone to try heroin/fentanyl that he had just received from WILLIS in order to make sure it was not too weak or too potent. I know that individuals involved in trafficking heroin/fentanyl often mix it with non-controlled substances, known as "cutting agents," to reduce the potency of the heroin/fentanyl and increase their profits. At 8:56 PM, JEFFRIES, on TARGET TELEPHONE #5 (Session 00123), placed an

outgoing call to MICHAEL JEFFRIES (hereinafter "M.JEFFRIES"), on telephone number (681)215-9155. Based on my training, experience, and the investigation thus far, I believe JEFFRIES sent M. JEFFRIES to find cutting agent for heroin/fentanyl ("What about the spot across from Hardee's?", "On Bigley.") but M. JEFFRIES said that all the places that sell cutting agents are closed ("Every where's closed.") and that he did try FreeDome Smoke Shop ("That's where I went to."). FUNDERBURK was also heard in the background contributing to the conversation by suggesting FreeDome Smoke Shop on Bigley Avenue in Charleston, West Virginia. At 9:41 PM, JEFFRIES, on TARGET TELEPHONE #5 (Session 00124), received an incoming call from M. JEFFRIES, on telephone number (681) 215-9155. Based on my training, experience, and the investigation thus far I believe M. JEFFRIES told JEFFRIES that he found cutting agent for heroin/fentanyl ("yeah, I found some."). JEFFRIES told him to bring it to the SUBJECT PREMISES ("[UI] bring it to me at Scoots."). Investigators know that "Scoot" is a nickname used by FUNDERBURK. Based on all law enforcement surveillance and the above calls, investigators believe that WILLIS retrieved heroin/fentanyl from an individual inside the 2012 Kia Optima LX bearing West Virginia registration 4WN522 in Bluefield, West Virginia on January 29, 2023, and brought it back to the SUBJECT PREMISES for FUNDERBURK and JEFFRIES.

13

13.    On March 5, 2023, at approximately 2:23 PM, FUNDERBURK on TARGET TELEPHONE #6 (Session 02947), placed an outgoing call to JOHN LOUDERMILK ("hereinafter "LOUDERMILK"), on telephone number (304) 610-8155. The following was discussed:

LOUDERMILK:     Hello?

FUNDERBURK:     Sup mother fucker.

LOUDERMILK:     What's up mother fucker? You ain't working are you?

FUNDERBURK:     Yeah. I'm about to.

LOUDERMILK:     No! I need two grams bro.

FUNDERBURK:     When?

LOUDERMILK:     Right now.

FUNDERBURK:     Alright. Give me uhhh a couple minutes and I'll call you back and I'll meet you at my house.

LOUDERMILK:     Okay

FUNDERBURK:     Alright.

LOUDERMILK:     Just call me and I'll be there.

FUNDERBURK:     Alright.

LOUDERMILK:     Alright.

14.    Based on my training, experience, and investigation thus far, I believe LOUDERMILK asked FUNDERBURK if he was working at the Olive Garden at the time so he could meet FUNDERBURK and purchase controlled substances ("What's up mother fucker? You

ain't working are you?") to which FUNDERBURK replied that he was
about to go to work ("Yeah. I'm about to."). LOUDERMILK told
FUNDERBURK that before FUNDERBURK went to work he needed two grams
of a controlled substance ("No! I need two grams bro."). FUNDERBURK
asked when he needed the two grams ("When?") to which LOUDERMILK
replied that he needed them immediately ("Right now"). FUNDERBURK
told LOUDERMILK to give him a few minutes and when FUNDERBURK was
ready he would call LOUDERMILK back so they could meet at the
SUBJECT PREMISES ("Alright. Give me uhhh a couple minutes and I'll
call you back and I'll meet you at my house."). LOUDERMILK agreed
("Just call me and I'll be there.").

15.    On March 5, 2023, at approximately 2:56 PM, FUNDERBURK
on TARGET TELEPHONE #6 (Session 02949), placed an outgoing call to
LOUDERMILK, on telephone number (304)610-8155 and an unknown
female (hereinafter "UF") answered the phone. The following was
discussed:

| | |
|---|---|
| **UF:** | Hello? |
| **FUNDERBURK:** | Yo |
| **UF:** | Yo. |
| **FUNDERBURK:** | Tell him give me enough time to jump in the shower then come on. |
| **UF:** | Okay, how long it take you to do that? |
| **FUNDERBURK:** | Bout six, seven minutes. |
| **UF:** | Oh, okay, alright bye. |

(end call)

16.    Based on my training, experience, and investigation thus far, I believe FUNDERBURK called LOUDERMILK back to arrange the previously discussed drug transaction and an unknown female answered the telephone. FUNDERBURK told the UF to tell LOUDERMILK that he was ready to conduct the controlled transaction after he took a shower. ("Tell him give me enough time to jump in the shower then come on.") UF asked how long it would take ("Okay, how long it take you to do that?"). FUNDERBURK told the UF it would take six to seven minutes ("Bout six, seven minutes.").

17.    On March 5, 2023, at approximately 3:11 PM, investigators observed via pole camera as an 80's model dark blue and gray striped Chevrolet van backed into the driveway of the SUBJECT PREMISES. A white male driver, believed to be LOUDERMILK, wearing a blue jean shirt with a red undershirt and a white female passenger wearing a gray T-shirt exited the vehicle, knocked on the side door of the SUBJECT PREMISES, and then went inside the SUBJECT PREMISES. At approximately 3:13 PM, surveillance observed another white female wearing a black T-shirt walk from down the street to the side door of the SUBJECT PREMISES, knock, and go inside.

18.    On March 9, 2023 at approximately 12:36 PM, FUNDERBURK on TARGET TELEPHONE #6 (Session 3500), received an incoming call from DAVIS, on TARGET TELEPHONE #9. The following was discussed:

| | |
|---|---|
| **DAVIS:** | Yo where you at? |
| **FUNDERBURK:** | Chandler. |
| **DAVIS:** | Huh? |
| **FUNDERBURK:** | Chandler, Chandler, yeah |
| **DAVIS:** | Hey uh, meet me on the east. |
| **FUNDERBURK:** | Um, I gotta shower, but I ain't got time do I? |
| **DAVIS:** | Uh yeah, put that, put that half, put that one thing though, cause I'm gonna need that if you got to go to work. |
| **FUNDERBURK:** | Nah. |
| **DAVIS:** | What? |
| **FUNDERBURK:** | I got it with me. |
| **DAVIS:** | Huh? |
| **FUNDERBURK:** | I got it with me. |
| **DAVIS:** | Yeah but you about to go work. |
| **FUNDERBURK:** | Nah I ain't gotta work. |
| **DAVIS:** | Oh, well just call me, I'll see if old girl can bring it outside, she probably can, but I'm gonna fucking go home. |
| **FUNDERBURK:** | Um, I need, if I need to go over there right now I can. |
| **DAVIS:** | Say what? |
| **FUNDERBURK:** | I said if I need to just throw my shit back on and goddamn shoot over there I can? |

| | |
|---|---|
| **DAVIS:** | Alright |
| **FUNDERBURK:** | Whatchu want me to do? |
| **DAVIS:** | I'm about to, I'm dropping this off, I'm going home, I'm going to Saint Albans. |
| **FUNDERBURK:** | (UI) Meet you up there by the time you drop it off? |
| **DAVIS:** | Huh? |
| **FUNDERBURK:** | You, you want me to meet you now, or later? |
| **DAVIS:** | Uh, I was saying meet me now but you just said you gonna- |
| **FUNDERBURK:** | Alright, I'm finna put my clothes on, finna put (UI) on, gimme about ten minutes |
| **DAVIS:** | Alright |
| **FUNDERBURK:** | Alright. |
| | (end call) |

19.     Based on my training, experience, and the investigation thus far, I believe FUNDERBURK told DAVIS that he was at the SUBJECT PREMISES when DAVIS asked for his location ("Chandler.") DAVIS told FUNDERBURK to meet him on the East end of Charleston, West Virginia and to bring money that FUNDERBURK owed DAVIS for a drug transaction because DAVIS needed to get it before FUNDERBURK went to work ("Hey uh, meet me on the east.") ("Uh yeah, put that, put that half, put that one thing though, cause I'm gonna need that if you got to go to work").

18

Investigators believe that FUNDERBURK had previously paid DAVIS part of the money that FUNDERBURK owed DAVIS for controlled substances that FUNDERBURK expected to receive from DAVIS, and that DAVIS wanted to collect the rest during the meeting discussed in this call.   FUNDERBURK told DAVIS that he had the money with him ("I got it with me.") DAVIS told FUNDERBURK to call him when he was ready and that he would try to have a female bring the controlled substances outside to him ("Oh, well just call me, I'll see if old girl can bring it outside, she probably can, but I'm gonna fucking go home") FUNDERBURK asked DAVIS when he wanted to meet up("You, you want me to meet you now, or later?") DAVIS told FUNDERBURK he wanted to meet up now ("Uh, I was saying meet me now but you just said you gonna-") FUNDERBURK told DAVIS he would be ready to meet in about 10 minutes ("Alright, I'm finna put my clothes on, finna put (UI) on, gimme about ten minutes").

   20.  On March 9, 2023, FUNDERBURK was observed via pole camera at the SUBJECT PREMISES. At approximately 12:45 PM, FUNDERBURK was observed exiting the side door of the SUBJECT PREMISES with a child's bicycle, several plastic shopping bags, and a grey shoebox under his left arm that he placed in his black Jeep Cherokee. FUNDERBURK entered the driver's side of the Jeep and at approximately 12:48 PM he departed from the SUBJECT PREMISES. Investigators conducted physical surveillance of FUNDERBURK

and, at approximately 1:20 PM, observed DAVIS's white Kia Optima and FUNDERBURK's Jeep parked in front of Sanctuary Apartments located at 6 Crestmont Drive, Charleston, West Virginia 25311. Investigators were able to observe DAVIS and FUNDERBURK sitting inside of FUNDERBURK's Jeep using aerial drone surveillance. At approximately 1:35 PM, DAVIS exited FUNDERBURK's vehicle and FUNDERBURK departed from the location. At approximately 1:41 PM, surveillance observed that DAVIS was not in his vehicle. Simultaneously, FUNDERBURK was observed via pole camera arriving at his other residence located at 1548 Lee Street East, Charleston, West Virginia. FUNDERBURK retrieved a bicycle out of the rear of the Jeep along with multiple bags and entered inside the residence through the front door. The Jeep then departed from 1548 Lee Street East, Charleston, West Virginia driven by LATESHA NAPPIER.

**BACKGROUND: ITEMS TO BE SEIZED**

21.  Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

a) Individuals involved in narcotics trafficking often maintain the following items in their residences: controlled substances and paraphernalia for packaging,

weighing, cutting, testing, distributing, and manufacturing controlled substances.

b) Individuals involved in narcotics trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time. It is common, for example, for narcotics traffickers to keep pay/owe sheets or other papers of narcotics sold and monies owed. Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts. Such records are often maintained for a substantial period of time, even after the debts are collected. I have found in my training and experience that such records are invaluable to narcotics traffickers and that such records are rarely discarded. Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers, and co-conspirators.

c) Individuals involved in narcotics trafficking must often rely on others to obtain their drugs and to help them market the narcotics. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residences.

d) Individuals involved in narcotics trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including: placing assets in the names of other individuals so that they may avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace.  Records of these and other types of transactions are often found at residences of individuals involved in narcotics trafficking.

e) Individuals involved in narcotics trafficking often keep and maintain large amounts of United States currency at their residences. Such funds are often used for everyday expenditures and to maintain and finance their ongoing narcotics business.  Additionally, individuals involved in narcotics trafficking often amass and maintain assets at their residence which were generated by their trafficking activities or purchased with the cash earned from such trafficking.

f) Individuals involved in narcotics trafficking often maintain weapons, firearms, and ammunition on their

person or in their residence and/or vehicles. Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution of drugs and firearms. Furthermore, I am aware of instances in which traffickers have maintained such items in their residences and vehicles in order to protect themselves and guard their drugs, firearms and profits, as well as for enforcement purposes during their narcotics and firearms dealings.

g) Residences and premises used by individuals involved in narcotics trafficking usually contain articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting, or controlling the residence and premises.

h) Individuals involved in narcotics trafficking frequently communicate with co-conspirators by means of cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their residences and vehicles.

i) Individuals involved in narcotics trafficking often utilize radio scanners, police radios and other electronic equipment in order to conduct counter-surveillance upon law enforcement authorities, and

usually maintain these items on their person and/or in their residences and vehicles.

j) Individuals involved in narcotics trafficking often maintain photographs, and/or audio and video recordings of their associates or real and personal property which were acquired with narcotics proceeds or property utilized to facilitate narcotics trafficking activities. Such items are typically maintained in their residences. Drug traffickers often store information relating to their drug trafficking business on computers and/or computer disks.

22.     Documents/Records: It is also my opinion and belief that the above-described documents are currently possessed by narcotics dealers and manufacturers much the same way a legitimate business will maintain records and tools of its trade whether or not the business has a particular item in inventory on a given date. These documents are kept by narcotics dealers whether or not the dealer is in possession of any drugs at any given moment. I believe that the seizure of such documents will provide evidence of the events set forth in this affidavit and that such documents can be found at the SUBJECT PREMISES despite any lapse of the time between the events described and the anticipated search pursuant to this warrant.

24

23.     Cellular Telephones: In this case, there is probable cause that FUNDERBURK utilizes cellular telephones to facilitate his drug trafficking activities.  It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular telephones today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. Cellular service providers allow for their subscribers to access their device over the internet and remotely destroy all of that data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "airplane mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may

25

be so acquired.    Conversations can be hidden in various applications. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography.   This process is time and labor intensive and may take weeks or longer. Consequently, this warrant seeks authorization to seize and secure cellular telephones found at the SUBJECT PREMISES and to search or analyze the same off-site by one or more trained examiners.

(This space is intentionally left blank.)

24.    The investigation into the criminal activities of the above individuals reveals that their drug distribution activities are ongoing.  Due to the quantities of narcotics being distributed and the relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe they have been engaged in the illegal sale of narcotics for a long period of time.  Based on my training and experience, I believe that the criminal activity described above is, by nature, self-perpetuating.  Several of the participants involved in the drug distribution have been targets of law enforcement for several

26

years. They have been arrested on drug distribution investigations in the past, but these arrests have not deterred them from continuing in the business of drug trafficking and distribution. I believe that the items described in Attachment B will provide evidence of the events set forth in this affidavit and that such articles can be found at the SUBJECT PREMISES despite any lapse of time between the events described and the anticipated search pursuant to this warrant.

Further you Affiant sayeth naught.

Respectfully submitted,

Ambra M. Dunn, Special Agent
Drug Enforcement Administration

Sworn to me by telephone or other reliable electronic means on March 14, 2023.

DWANE L. TINSLEY
United States Magistrate Judge

27